J-E01004-23

2023 PA Super 172

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| NATHANIEL WILLIAMS | : | No. 980 EDA 2021 |

Appeal from the Order Entered April 22, 2021
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): MC-51-CR-0030428-2019

BEFORE: PANELLA, P.J., BENDER, P.J.E., LAZARUS, J., OLSON, J., STABILE, J., DUBOW, J., NICHOLS, J., McLAUGHLIN, J., and McCAFFERY, J.

DISSENTING OPINION BY OLSON, J.: **FILED SEPTEMBER 20, 2023**

I believe that the Commonwealth presented sufficient evidence at the preliminary hearing stage to hold Appellee, Nathaniel Williams, for court on one count each of unsworn falsification (18 Pa.C.S.A. § 4904(a)), tampering with or fabricating physical evidence (18 Pa.C.S.A. § 4910), tampering with public records (tier-3 felony) (18 Pa.C.S.A. § 4911), and obstructing administration of law or other governmental function (18 Pa.C.S.A. § 5101). Therefore, I must respectfully dissent.

The learned Majority sets forth the proper standard of review in determining whether the Commonwealth met its burden of proof in presenting a *prima facie* case against Appellee during the preliminary hearing stage. Majority Opinion at 6-7. Although accurately reciting the legal principles, the Majority deviates from the well-settled law in concluding that the

Commonwealth failed to meet its burden. Instead, the Majority holds the Commonwealth to a more stringent standard; *i.e.* the Commonwealth is required to disprove or rebut interpretations of the evidence that favor Appellee, even when the evidence presented provides for a reasonable inference that a crime was committed and that Appellee was the person who probably committed the crime. In my view, this is error.

Our Supreme Court has repeatedly provided that a "preliminary hearing is not a trial. … At this hearing, the Commonwealth bears the burden of establishing at least a *prima facie* case that a crime has been committed and that the accused is probably the one who committed it." **Commonwealth v. Perez**, 249 A.3d 1092, 1102 (Pa. 2021), *quoting* **Commonwealth v. McBride**, 595 A.2d 589, 591 (Pa. 1991) (emphasis omitted). Moreover,

> [a] *prima facie* case exists when the Commonwealth produces evidence of each of the material elements of the crime charged and establishes probable cause to warrant the belief that the accused committed the offense. … A judge at a preliminary hearing is not required, nor is he authorized to determine the guilt or innocence of an accused; his sole function is to determine whether probable cause exists to require an accused to stand trial on the charges contained in the complaint. … The weight and credibility of the evidence are not factors at the preliminary hearing stage, and the Commonwealth need only demonstrate sufficient probable cause to believe the person charged has committed the offense. …
>
> Inferences reasonably drawn from the evidence of record which would support a verdict of guilty are to be given effect, and the evidence must be read in the light most favorable to the Commonwealth's case. The use of inferences is a process of reasoning by which a fact or proposition sought to be established is deduced as the logical consequence from the existence of other facts that have been established. The more-likely-than-not test

- 2 -

must be applied to assess the reasonableness of inferences relied upon in establishing a *prima facie* case of criminal culpability.

***Perez***, 249 A.3d at 1102-1103 (brackets and quotation marks omitted). "The trial court is afforded no discretion in ascertaining whether, as a matter of law and in light of the facts presented to it, the Commonwealth has carried its pre-trial, *prima facie* burden to make out the elements of a charged crime." ***Commonwealth v. Karetny***, 880 A.2d 505, 513 (Pa. 2005).

In applying these legal principles to the facts of this case, I believe that the Commonwealth clearly met its burden of establishing a *prima facie* case that Appellee committed the four offenses charged. Accordingly, I would reverse the trial court so that all four charges against Appellee may proceed.

In analyzing whether the Commonwealth met its burden of proof, we must begin with the pertinent facts that were established during the two preliminary hearings on September 11, 2020 and April 22, 2021.[1]

On October 14, 2017 at approximately 12:00 p.m., Theresa Williams[2] was in the parking lot of Michaels craft store. N.T. Preliminary Hearing,

---

[1] As noted by the Majority, at the preliminary hearing on September 11, 2020, the trial court dismissed all charges against Appellee. The Commonwealth refiled the charges and a second preliminary hearing was held on April 22, 2021. At the April 2021 hearing, the testimony from the September 2020 hearing was incorporated and the Commonwealth introduced a transcription of a police interview of Appellee and telephone records. Majority Opinion at 1-2.

[2] All parties agree that Theresa Williams is not related to Appellee or Edwin Williams who was charged as a co-defendant. The charges against Edwin Williams are not at issue in this case.

- 3 -

9/11/20, at 6. While in the parking lot, Edwin Williams ("Edwin") approached Ms. Williams and tried to start a conversation. He asked for her phone number and indicated that he wanted to take her out, however, Ms. Williams stated that she was not interested. *Id.* at 8. During the brief conversation, Edwin told Ms. Williams that he was a bus driver for the Southeastern Pennsylvania Transportation Authority ("SEPTA"). *Id.* at 9. Ms. Williams proceeded to get into her vehicle at which time Edwin walked away. As Ms. Williams went to back out, Edwin came up behind her in his vehicle and stopped. He was looking in the direction of her vehicle. *Id.* at 8-9.

Approximately a week or two later, Edwin arrived at Ms. Williams' home and knocked on her door. Ms. Williams opened the door "and asked how the hell he found [her]." *Id.* at 9-10. Edwin responded that "he had his ways." *Id.* at 13-14. Edwin persisted in talking with Ms. Williams, so in an effort to get him to leave, she asked him to write his name and telephone number on a piece of paper. *Id* at 10. Edwin then left.

During the next few weeks, Edwin continued to contact Ms. Williams indirectly by leaving a greeting card and roses on her vehicle. *Id.* at 16. Eventually, Ms. Williams filed a report with the SEPTA Police Department which, in turn, notified the Philadelphia Police Department. *Id.* at 10-11, 28.

On November 2, 2017, Lieutenant James Clough of the Internal Affairs Division of the Philadelphia Police Department was assigned to investigate the complaint filed by Ms. Williams. *Id.* at 56, 59. In the complaint, Ms. Williams

alleged that someone had approached her and she suspected that her vehicle license tag had been "run which led to someone coming to her home." *Id.* at 58. On November 7, 2017, Lieutenant Clough requested all computerized inquiries that were made by Appellee on October 17, 2017 to determine whether these computer systems were accessed to obtain information about Ms. Williams.[3] *Id.* at 59, 61. These systems included the National Crime Information Center ("NCIC"), the Police Crime Information Center ("PCIC") and the Pennsylvania Justice Network ("JNET"). Lieutenant Clough discovered that, on October 17, 2017 (three days after Edwin first approached Ms. Williams in the Michaels craft store parking lot), Appellee accessed Ms. Williams' license plate tag at 3:35 p.m. and her voter registration at approximately 3:37 p.m. At 3:42 p.m., he searched Ms. Williams' name on JNET. *Id.* at 61-62, 64. Within days after these searches, Edwin appeared at Ms. Williams' doorstep.

As part of his investigation, Lieutenant Clough interviewed Edwin on November 24, 2017.[4] During the interview, Edwin claimed that he did not

_____

[3] Appellee used his police payroll number to access these computer systems; accordingly, Lieutenant Clough audited the systems that had been accessed by Appellee's police payroll number. N.T. Preliminary Hearing, 9/11/20, at 59.

[4] During the September 2020 preliminary hearing, Lieutenant Clough read into the record Edwin's written statement which Edwin signed acknowledging that the statement was true and correct to the best of his knowledge. N.T. Preliminary Hearing, 9/11/20, at 68-76.

know Appellee well. In fact, he stated that he only met Appellee one time when a friend introduced them at a party. *Id.* at 74. He stated that they merely shook hands. *Id.* at 75. Edwin stated that he never spoke with Appellee again and that they never spoke to each other via telephone or text messages. *Id.* at 74-75.

On December 27, 2017, Lieutenant Clough interviewed Appellee.[5] Appellee stated that he was employed as an officer with the Philadelphia Police Department in the Homicide Division. N.T. Preliminary Hearing, 4/22/21, at 32. He claimed that he was investigating a homicide and, during the investigation he witnessed the target of the investigation getting into a vehicle. Therefore, on October 17, 2017,[6] he did a computer search of the license plate tag of the vehicle that the target entered. *Id.* at 35. Once he obtained the identity of Ms. Williams from searching the license plate tag, Appellee did various computer cross-checks including voter registration,

_____

[5] At the preliminary hearing held on April 22, 2021, Lieutenant Clough read into the record the written statement given by Appellee. N.T., Preliminary Hearing, 4/22/21, at 29, 32-45. The written statement was in the form of a transcript as it recited the specific questions posed by Lieutenant Clough and the answers given by Appellee.

[6] Appellee stated that he worked the 7:00 a.m. to 3:00 p.m. shift on October 17, 2017. However, he worked an additional four hours of overtime from 3:00 p.m. to 7:00 p.m. N.T. Preliminary Hearing, 4/22/21, at 33. Appellee did not do the computer search during his regular shift; instead, he searched the computer systems for information regarding Ms. Williams beginning at 3:35 p.m. while he was working overtime.

criminal histories, property ownership and social media. [7]  *Id.* at 36.  Appellee

stated that he performed these computer searches to establish a connection

_____

[7] Specifically, Appellee told Lieutenant Clough the following:

> **QUESTION:**  Does the name Theresa Williams sound familiar in any of the ongoing investigations by you or any member of your squad or unit?
>
> **ANSWER:**  There are some lawyers involved in the Williams Avenue case.  It was a case from Northwest.  It was from a shooting that happened on July 31st, and the decedent died on 8-1-17.
>
> **QUESTION:**  Does the name Theresa Williams from the 6600 block of Ogontz Avenue have anything to do with the investigation of the homicide you mentioned from Williams Avenue?
>
> **ANSWER:**  I have not determined that yet.  I saw the target of my investigation Tashaun Curtis get into a car a couple of months ago on the 6600 block of Ogontz right in front of his house.  I was driving by.  I saw him get into a white or white-colored SUV or van, and I drove around the block and the car was gone.  A day later I surveyed the neighborhood, and I saw a vehicle that I though[t] he had gotten into.  I ran the tag.
>
> **QUESTION:**  What follow[-]up did you do with that tag information?
>
> **ANSWER:**  All kinds of cross[-]checks, car stops, 48-A's, voters, real estate, criminal history, property ownership and social media.
>
> **QUESTION:**  Who was with you when you saw Tashaun Curtis get into the vehicle.
>
> **ANSWER:**  No one.
>
> **QUESTION:**  What is the case number that is assigned to the Williams Avenue homicide?

*(Footnote Continued Next Page)*

to the target that he was investigating. *Id.* at 42. The information obtained from these computer searches identified Ms. Williams; however, he could not connect her to the target. *Id.* at 39.

Also during the interview, Appellee stated that Edwin was his cousin (directly contradicting Edwin who stated that he only met Appellee one time briefly at a party). Appellee stated that he did not talk with Edwin frequently and last spoke with him approximately a year ago. *Id.* at 36. Appellee denied ever talking to Edwin about Ms. Williams and denied providing Edwin with the information he obtained from the computer searches regarding Ms. Williams. *Id.* at 39-42.

At the end of the written statement, Appellee signed the statement acknowledging that he "read the foregoing statement consisting of six pages and it is true and correct to the best of my knowledge." *Id.* at 44-45. Appellee also signed each page of the written statement. *Id.* at 29.

Immediately following the interview of Appellee, Lieutenant Clough went to the Homicide Division to obtain the M17-185 case file. He was provided with one file folder. N.T. Preliminary Hearing, 9/11/20, at 77. This folder contained no information regarding Ms. Williams. *Id.* at 78. The next day, Lieutenant Clough was informed that Appellee had called to advise Lieutenant

---

**ANSWER:** M17-185, I think.

N.T. Preliminary Hearing, 4/22/21, at 34-36.

Clough that there was a second folder related to the M17-185 homicide investigation. This folder contained a photograph of Ms. Williams and her children taken from her Facebook page. On the back of the photograph were handwritten notes regarding Ms. Williams, including her license plate number and that she had "no record/no wants." *Id.* at 78. Lieutenant Clough testified that the photograph was from a publicly available Facebook page.[8] Lieutenant Clough reviewed the entire second folder and noted that the photograph of Ms. Williams was the only document contained within the folder that had handwriting. All of the other documents in the folder were "printouts of various licen[s]e plates, tags, houses that were checked." *Id.* at 80. In other words, the document referencing Ms. Williams was different from the other information contained within the folder. *Id.*

Lieutenant Clough also obtained the records for the telephone numbers for which Appellee and Edwin were identified as the subscribers. Contrary to the statement given by Edwin that he never communicated with Appellee after meeting him at a party and the statement given by Appellee that he and Edwin had not communicated with each other in a year or more, the telephone records revealed that there were numerous telephone calls and text messages between the two telephone numbers in early and mid-October 2017, including

_____

[8] Lieutenant Clough stated that he logged onto Facebook and was able to retrieve the same photograph of Ms. Williams without any restrictions such as being "a friend of Ms. Williams." N.T. Preliminary Hearing, 9/11/20, at 79.

text messages being exchanged on October 14, 2017, the day Edwin encountered Ms. Williams in the Michaels craft store parking lot. *Id.* at 87. Most critically, there were five text messages between the two telephone numbers on October 17, 2017, just minutes before Appellee accessed the NCIC, PCIC and JNET computer systems to obtain information regarding Ms. Williams. *Id.* at 87-88. These telephone calls and text messages continued into early November and then ceased. On November 24, 2017, the same day of Lieutenant Clough's interview of Edwin, Appellee replaced his telephone with another. *Id.* at 88.

Based upon this evidence, the Commonwealth filed the four charges against Appellee. When viewing this evidence in a light most favorable to the Commonwealth, including all inferences reasonably drawn therefrom, I conclude that the Commonwealth met its burden of proof in establishing a *prima facie* case against Appellee on all four charges.

**Unsworn Falsification to Authorities**

A person commits the offense of unsworn falsification to authorities where, "with [the] intent to mislead a public servant in performing his official function, he: (1) makes any written false statement which he does not believe to be true." 18 Pa.C.S.A. § 4904(a).

As established at the preliminary hearings, Lieutenant Clough interviewed Appellee on December 27, 2017. Lieutenant Clough then transcribed the interview onto a six-page document entitled "Statement of

- 10 -

Detective Nathaniel Williams." Appellee signed at the end of the statement acknowledging that he "read the foregoing statement consisting of six pages and it is true and correct to the best of my knowledge." N.T. Preliminary Hearing, 4/22/21, at 44-45. Appellee also signed each page of the written statement.

The Majority does not address whether Appellee provided false information to Lieutenant Clough during this interview but instead concludes that "[t]he Internal Affairs interview, which was conducted as an oral interview, memorialized in writing by Lieutenant Clough, and signed by [Appellee], does not constitute a 'written false statement,' under [18 Pa.C.S.A. § 4904(a).]" Majority Opinion at 8-9. In support of this conclusion, the Majority cites to only one case, **Commonwealth v. Gaithers**, 13 Pa.D.&C. 3d 668 (Pa. C.P. Montg. 1978). **Id.** at 9. The Majority's reasoning for citing **Gaithers** is not readily apparent because it is a 1978 decision of the Court of Common Pleas of Montgomery County in which the trial court found that the evidence was sufficient to convict the defendant of unsworn falsification where the defendant signed a **Miranda**[9] rights form using a false name. I do not believe that this case lends support to the Majority's conclusion. Instead, I believe that Appellee's conduct amounted to "making" a false written statement.

_____

[9] **Miranda v. Arizona**, 384 U.S. 436 (1966).

There is nothing in the language of the statute that requires the defendant to be the actual scrivener of the written statement at issue. Lieutenant Clough contemporaneously transcribed Appellee's oral statements provided during the interview. Appellee adopted the entire transcription by signing all six pages and attesting to the fact that the "foregoing statement" was "true and correct to the best of [his] knowledge." N.T. Preliminary Hearing, 4/22/21, at 44-45. These acknowledgements and attestations make the statement Appellee's own. There is no reason why an individual would not be liable under Section 4904(a) for attesting to the truth of a written statement that was memorialized by a third party. In fact, it is commonplace for signatories to affidavits prepared by third parties to be subject to the penalties prescribed by Section 4904. *See e.g.*, 42 Pa.C.S.A. § 102 (definition of "affidavit" in the Judicial Code, including "an unsworn document containing statement of fact and a statement by the signatory that it is made subject to the penalties of 18 Pa.C.S. § 4094.").

Moreover, this Court previously affirmed a conviction under Section 4904(a) where a false written statement was memorialized by a third party and then adopted by the way of the defendant's signature. In *Commonwealth v. Cherpes*, 520 A.2d 439 (Pa. Super. 1987), the defendant served as the chairman of a local municipality's board of commissioners. As such, he was required by law to file financial disclosure statements. The defendant filed a financial disclosure statement that failed to disclose certain

income that he received through his insurance business. He claimed that he was out of town when the statement was due; therefore, his wife completed as well as signed the form. During trial, evidence was presented that the signature was, in fact, the defendant's signature. Although the form was completed by the defendant's wife, the jury found the defendant guilty of violating Section 4904(a). On appeal, this Court held that, drawing all reasonable inferences in favor of the Commonwealth, the jury properly convicted the defendant of unsworn falsification.

As I believe that the written statement signed by Appellee was a "written statement" as required by Section 4904(a), I turn to whether the evidence presented at the preliminary hearings was sufficient to establish a *prima facie* case that Appellee made false statements to Lieutenant Clough in an effort to mislead him. The Majority does not address whether Appellee lied or misled Lieutenant Clough, but I believe that, viewed in the light most favorable to the Commonwealth, the record provides ample evidence that Appellee was being untruthful in an effort to derail Lieutenant Clough's official investigation. Indeed, viewed in the light most favorable to the Commonwealth, the record reveals the following.

During the interview, Appellee was untruthful when he stated that he had not "spoken to" his cousin, Edwin, for a year or more. This statement is directly contradicted by the telephone records from Appellee and Edwin that show numerous telephone calls and text messages were exchanged between

the two men during the relevant time period, including on October 14, 2017, the day Edwin encountered Ms. Williams in the Michaels craft store parking lot, and October 17, 2017, the day Appellee accessed the police databases.[10] Most critically, the two men stopped communicating (even via text messaging) in early November 2017 when Lieutenant Clough began his investigation. Moreover, on November 27, 2017, the day Lieutenant Clough interviewed Edwin, Appellee replaced his telephone.

Appellee also denied that he used government databases to assist his cousin in learning Ms. Williams' personal information, however, there is ample evidence to support that that is exactly what occurred. The record supports the reasonable inference that Appellee obtained Ms. Williams' personal information at Edwin's request. On October 14, 2017, the day on which Edwin

_____

[10] Appellee acknowledges that Appellee and Edwin communicated via text messaging, however, he argues that "while Appellee and Edwin communicated with each other frequently via text message, Appellee was not asked when he last communicated with Edwin. Rather, he was specifically asked when he last spoke to Edwin. And, while the Commonwealth introduced into evidence cell phone records that demonstrated that Appellee and Edwin had apparently attempted to call each other, none of the calls was longer that two minutes in duration which suggested that the men did not in fact speak as the lines were engaged only long enough to activate the phones' voice mail messages." Appellee's Substituted Brief at 18. I find this argument to be specious. Although Lieutenant Clough asked Appellee when he had last "spoken to" Edwin, it can reasonably be inferred that Lieutenant Clough was inquiring as to all types of communication between Appellee and Edwin, and that Appellee understood the question to include text messages (that Appellee does not deny occurred). Moreover, whether or not Appellee and Edwin actually spoke during the two minute telephone calls that were noted on the telephone records is a question of fact for a jury to decide.

encountered Ms. Williams in the parking lot and Edwin pulled his vehicle behind Ms. Williams' vehicle and looked in the direction of her license plate, there were text messages between Edwin and Appellee. Three days later (October 17, 2017), there were five text messages between Appellee and Edwin, just minutes before Appellee accessed the NCIC, PCIC and JNET computer systems to obtain information regarding Ms. Williams. There were additional text messages between the two men over the next several days. Shortly after Appellee obtained Ms. Williams' information, Edwin just happened to arrive at Ms. Williams' doorstep and, when asked how he found her, he responded that "he had his ways." In applying the more-likely-than-not test addressed by our High Court in **Perez, supra**, I believe that it is more likely than not that Appellee accessed the various computer systems on October 17, 2017 to provide his cousin with Ms. Williams' address.

Appellee claimed that he legitimately obtained Ms. Williams' personal information as part of a homicide investigation that he was conducting and that he did not obtain this information to provide to his cousin. However, consideration of his alternative explanation, his credibility and the weight of conflicting evidence must be reserved for the jury in the first instance. The trial court was not permitted at the preliminary hearing stage to credit Appellee's story and disregard the Commonwealth's explanation as all evidence and reasonable inferences drawn therefrom must be viewed in favor of the Commonwealth.

Viewed in the proper manner, since the record reflects that Appellee gave a false written statement to Lieutenant Clough with an intent to mislead, I believe that the trial court erred as a matter of law in dismissing the unsworn falsification charge.

**Tampering With or Fabricating Physical Evidence.**

A person commits the offense of tampering with or fabricating physical evidence when that person,

> believing that an official proceeding or investigation is pending or about to be instituted, he:
>
> (1) alters, destroys, conceals or removes any record, document or thing with intent to impair its verity or availability in such proceeding or investigation; or
>
> (2) makes, presents or uses any record, document or thing knowing it to be false and with intent to mislead a public servant who is or may be engaged in such proceeding or investigation.

18 Pa.C.S.A. § 4910.

At the preliminary hearings, Lieutenant Clough testified that, immediately following the interview of Appellee during which Appellee stated that he accessed the computer systems to obtain Ms. Williams' personal information as part of a homicide that he was investigating, Lieutenant Clough went to the Homicide Division to obtain the M17-185 case file. He was provided with one file folder which contained no information regarding Ms. Williams. However, on the next day, Appellee called to advise Lieutenant Clough that there was a second folder. This folder contained a photograph of Ms. Williams and her children taken from her Facebook page and on the back

were handwritten notes with some of Ms. Williams' personal information. This photograph was the only document regarding Ms. Williams and was different than the other documents contained within the second folder which were computer printouts and had no handwriting. The Commonwealth argues that this is *prima facie* evidence that Appellee "manufactured the second homicide file after learning about [Lieutenant] Clough's investigation into his use of restricted access systems and did so knowing it to be false and with the intent to mislead [Lieutenant] Clough in conducting that investigation." Appellant's Substituted Brief at 16.

The Majority disagrees, finding that there was insufficient evidence to establish that the information regarding Ms. Williams was added to the homicide file after Appellee learned of the Internal Affairs Division's investigation, and that there was no testimony that Lieutenant Clough "obtained the entire file when he initially procured it." Majority Opinion at 11. Respectfully, the Majority fails to follow the standard of review that we are required to follow at the preliminary hearing stage and discounts reasonable inferences that Appellee tampered with the file.

Viewed in the light most favorable to the Commonwealth, the evidence demonstrates that Appellee told Lieutenant Clough during the December 27, 2017 interview that he accessed the police databases to obtain Ms. Williams' personal information as part of a homicide that he was investigating. Immediately following the interview, Lieutenant Clough went to the

Philadelphia Police Homicide Division and requested homicide file M17-185 and he was provided with one file folder. There was no reference to Ms. Williams in the file. The next day, Appellee called to advise Lieutenant Clough that there was a second file and this file contained a photograph of Ms. Williams which had her personal information handwritten on the back. This second folder appeared suspect to Lieutenant Clough as the photograph appeared to come from a public Facebook page and the handwritten information contained on the back was the type of information that Lieutenant Clough had asked Appellee if he obtained regarding Ms. Williams.[11] In sum,

_____

[11] Specifically, during the preliminary hearing on September 11, 2020, the following exchange took place:

**Commonwealth**: The Facebook picture, did that appear to you that it came from a publicly available Facebook profile?

**Lieutenant Clough**: Yes, because I actually logged in and viewed it myself and I was able to see it without being restricted, without having to be a friend of Ms. Williams.

**Commonwealth**: And those handwritten notes, was that all information that you would have referred to in [Appellee's] interview with him?

. . . .

**Lieutenant Clough**: Those things that were handwritten on there, yes. They were in – some of them were in the interview of [Appellee], yes. And he received a copy of that interview at the conclusion of his statement.

*(Footnote Continued Next Page)*

the only material contained in the second folder regarding Ms. Williams was a print-out of a publicly available Facebook photograph, on the back of which Appellee had handwritten Ms. Williams' personal information corresponding to the same information that Appellee provided to Lieutenant Clough during the interview a day earlier. Unlike the other materials in the folder, Appellee did not print out any of the database inquiries of Ms. Williams from October 17, 2017.

It strains credulity to believe that a second file folder – containing information regarding Ms. Williams – was missing on December 27, 2017 when Lieutenant Clough retrieved and scoured file number M17-185 – which had no information regarding Ms. Williams – yet it immediately appeared one day later. Rather, viewing the evidence in the light most favorable to the

---

**Commonwealth**: Besides that Facebook page and the notes on the back was there any other reference to Theresa Williams in the file?

**Lieutenant Clough**: No, there was not. I looked extensively through that file. A lot of the inquiries that were made there was copies, there was printouts of various licen[s]e plates, tags, houses that were checked. And this was the only one, the only thing that was not printed out, it was just handwritten on the back of a Facebook page.

**Commonwealth**: So you are saying this information was different from the other checks that you saw in the file; is what you're saying.

**Lieutenant Clough**: Yes.

N.T. Preliminary Hearing, 9/11/20, at 79-80.

Commonwealth, it is reasonable to infer that Appellee altered homicide file M17-185 by creating a second folder of materials (which now included information regarding Ms. Williams) in order to corroborate his purported reason for accessing the police databases and he provided this second folder to Lieutenant Clough to mislead him. By ignoring the reasonable inferences drawn from this evidence and, instead, accepting the explanations given by Appellee, the Majority is making improper credibility determinations and, in essence, rendering a finding of innocence.

When viewed in a light most favorable to the Commonwealth, the evidence and all reasonable inferences drawn therefrom support a *prima facie* case that Appellee altered the homicide file by creating a second folder with Ms. Williams' photograph and personal information to mislead and thwart an official investigation. Accordingly, the trial court erred in dismissing the charge of tampering with or fabricating physical evidence.

**Tampering With Public Records or Information**

A person commits the offense of tampering with public records or information when he:

> (1) knowingly makes a false entry in, or false alteration of, any record, document or thing belonging to, or received or kept by, the government for information or record, or is required by law to be kept by others for information of the government;
>
> (2) makes, presents or uses any record, document or thing knowing it to be false, and with intent that it be taken as a genuine part of information or records referred to in paragraph (1) of this subsection; or

(3) intentionally and unlawfully destroys, conceals, removes or otherwise impairs the verity or availability of any such record, document or thing.

18 Pa.C.S.A. § 4911(a). When the offense is charged as a felony, as in this case, the Commonwealth must establish that the defendant acted with an intent to "defraud or injure." 18 Pa.C.S.A. § 4911(b). "Fraud" generally means "anything calculated to deceive, whether by single act or combination, or by suppression of truth, or suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or silence, word of mouth, or look or gesture." **Moser v. DeSetta**, 589 A.2d 679, 682 (Pa. 1991); **see also Commonwealth v. Kitchen**, 162 A.3d 1140, 1145 (Pa. Super. 2017).

I believe that the evidence adduced at the preliminary hearings, when viewed in a light most favorable to the Commonwealth, establishes a *prima facie* case for tampering with public records or information.

First, I agree with the learned Majority that the homicide file relied upon by Appellee to establish the legitimacy of his inquiries regarding Ms. Williams is a "record, document or thing belonging to, or received or kept by, the government for information or record." **See** Majority Opinion at 14; **see also Commonwealth v. Barger**, 375 A.2d 756, 763-764 (Pa. Super. 1977) ("It is a written report of an investigation of a motor vehicle accident which, at the very minimum, is kept by the State Police for informational purposes."). I part company, however, with my learned colleagues' finding that "the

Commonwealth failed to present a *prima facie* case that [Appellee] made a false entry or alteration to the file." Majority Opinion at 15.

The Majority concludes that "[t]he Commonwealth's assertion that [Appellee] 'falsified' the second file is mere supposition and speculation." ***Id.*** Again, I believe that the Majority is applying the wrong evidentiary standard in reviewing whether a *prima facie* case was established. Circumstantial evidence of a crime being committed is sufficient and conclusions must be reached after reviewing the evidence and all reasonable inferences drawn therefrom in a light most favorable to the Commonwealth. Here, the elements of tampering with public records, with the intent to defraud, were established circumstantially.

Viewed in a light most favorable to the Commonwealth, the evidence demonstrates the following. Ms. Williams was confronted by Edwin in a parking lot on October 14, 2017, at which time she rebuffed his efforts to go out with him. As Ms. Williams was leaving the parking lot, Edwin pulled up behind her and looked in the direction of the rear of her vehicle, *i.e.* the location of her license plate. On that day, text messages were exchanged between Edwin and Appellee.[12] Three days later, on October 17, 2017, Appellee accessed multiple police databases to obtain personal information regarding Ms. Williams, including her home address. Importantly, there were

---

[12] Again, Appellee does not deny that he and Edwin frequently sent text messages to each other. ***See*** Appellee's Substituted Brief at 18.

five text messages between Edwin and Appellee just minutes before Appellee accessed the NCIC, PCIC and JNET systems. Shortly after these databases were checked and information regarding Ms. Williams was obtained, Edwin appeared at Ms. Williams' door. When Edwin and Appellee were interviewed by Lieutenant Clough, they both lied about their communications with each other and, on the day of Edwin's interview, Appellee stopped using the cell phone that he had used previously to communicate with Edwin.

During his interview with Lieutenant Clough, Appellee tried to explain his purpose of accessing the police databases. He claimed to have been investigating a homicide when he just happened to have witnessed a target of that homicide enter a vehicle. Appellee contended that he accessed the license tag information for that vehicle to learn more about the target. When the information came back as belonging to Ms. Williams, he did additional searches to gather more information about her. Even though the suggested link between Ms. Williams and the murder suspect was both tenuous and uncorroborated, Appellee continued to access other databases to obtain more of Ms. Williams' personal information; however, he was never able to connect Ms. Williams to the homicide suspect.

Immediately after learning about this homicide investigation, Lieutenant Clough obtained the file folder identified by Appellee as the file related to the homicide investigation and there was no information in the file regarding Ms. Williams. One day later, Appellee produced a second folder which he claimed

was part of the homicide investigation file and, lo and behold, this second folder contained a Facebook photograph of Ms. Williams. Unlike all of the other items in both folders, the one photograph of Ms. Williams was publicly accessible, had handwritten notes on it, and was not time-stamped.

When viewing this evidence and all reasonable inferences in a light most favorable to the Commonwealth, I believe that it is more likely than not that Appellee used official computer systems to help Edwin locate Ms. Williams then tried to cover it up by manipulating a government record to make it appear as if Ms. Williams were involved in a murder investigation. Appellee acted intentionally to create a second folder as part of the M17-185 homicide investigation file to deceive Lieutenant Clough and mislead him to believe that his purpose for accessing these systems was legitimate. I acknowledge that Appellee gave an innocent explanation for his actions; however, it is not proper at this stage of the proceedings to rely on Appellee's self-serving statements and completely disregard the evidence that reasonably leads to the conclusion that Appellee tampered with public records in violation of 18 Pa.C.S.A. § 4911(a). Accordingly, the trial court erred in dismissing this charge.

**Obstructing Administration of Law or Other Governmental Functions**

A person commits the offense of obstruction of administration of law or other governmental functions "if he intentionally obstructs, impairs or perverts the administration of law or other governmental function by force, violence,

physical interference or obstacle, breach of official duty, or any other unlawful act." 18 Pa.C.S.A. § 5101. This crime requires more than "mere lying" or giving false information to a police officer. *See Commonwealth v. Shelly*, 703 A.2d 499, 503 (Pa. Super. 1997).[13] The conduct causing obstruction or interference must be an independently illegal act. *See id.*

The Majority concludes that the Commonwealth failed to meet its burden of establishing a *prima facie* case on the obstruction charge as the Commonwealth did not establish a *prima facie* case for the other crimes charged. I set forth in detail why the record compels a finding that the Commonwealth met its burden of establishing a *prima facie* case that Appellee violated Sections 4904(a) (unsworn falsification), 4910 (tampering with or fabricating physical evidence) and 4911 (tampering with public records) of the Crimes Code. Since there is no question that Lieutenant Clough was engaged in the administration of a governmental function while investigating Appellee, all of the elements of Section 5101 were met. Therefore, the trial court erred in dismissing the charge of obstruction.

For the foregoing reasons, I would reverse the trial court's orders dismissing the charges of unsworn falsification, tampering with or fabricating

---

[13] As the Majority notes, *Shelly*'s holding that providing false identification to law enforcement is not a crime has been superseded by 18 Pa.C.S.A. § 4914, however "that does not undermine its central holding that the 'unlawful act' element of Section 5101 can only be satisfied by allegations setting forth a violation of codified law." Majority Opinion at 17.

physical evidence, tampering with public records, and obstructing administration of law or other governmental function, and remand so that all four charges against Appellee may proceed.

President Judge Emeritus Bender, Judge Stabile and Judge Dubow join this Dissenting Opinion.